My name is Michael Diedrich. I'm an attorney for Appellant Joanne Fratello. My father did 35 missions in a B-24 over Germany. I spent two years Iraq, Afghanistan. I thought about democracy a lot, and I'm doing this case basically pro bono as to these ministerial immunity issues. I think this is the most important case this Court may ever decide, and you can decide it rightly or wrongly. I know which you think is right and which you think is wrong, but it seems to me, just as somebody who's going to try to figure this out, that one of the things that makes this case important, and tell me not if it's important but whether I've gotten the law and facts straight, is that this is the first time we have faced a case like this after the Supreme Court's Hosanna-Tabor decision. So it's to us to take that decision and see how it bears on our previous case law and how to apply it. That's why I've taken it so seriously, Your Honor, because I think this Court can set the light for the rest of the circuits on this issue, or it can obfuscate and really harm two major things. One is democracy itself. Look around us. Look how people are fighting. It's tribal. If we could teach our children to be good citizens, we'll have a democracy that works. If we teach our students indoctrination, and this is not a religious school involved here, Your Honor. This is a private school. Parochial schools are private schools. They teach a secular education. They have to. They're teaching the kids to be good students, good citizens. This runs a school. How is the school funded other than tuition? The school is funded by the parents of the parish, and the parish has a private school. It's a not-for-profit educational school. My client was hired as a teacher. Who oversees your client? The lay supervisors within the superintendent of schools of the archdiocese, who are all lay people. There's not one religious person who calls my client a minister. There's not one religious person who dictates the education. If you look, everything is Christian in general, but 23 percent of the students in the archdiocese schools are non-Catholics, including non-Christians and non-believers. I mean, the reason I ask these questions is I think you said this is not a religious institution. It's a – it's just a – No, it is a private school that's sponsored by a local parish who also is under the auspices of the archdiocese of New York. And when you talk about – and the lower court didn't like me getting into canon law, but when you talk about how the Catholic Church organizes itself, it has pastoral ministries that deal with the religious aspect, and it has ministries of service, economic, educational. This fits into that. In other words, it's not religious. There's nothing religious involved in my client's being a principal, a lay principal. She contracted for the job of lay principal in the school. There was nothing in that contract. The contract said you have to be a good Catholic, and that's all. It didn't say – it didn't imply, gave her no clue whatsoever that she was going to be a minister. And for the courts to, in a parochial school, a private school, or a Bible manufacturing company or a Hobby Lobby type thing? May I ask you a question? Would it have been proper – so the case is about termination, but I want to flip it a little bit. Would it have been proper for the school not to hire your client on the basis of her religion or on the basis, say, of her gender? Good question. Your Honor, that's why I have proposed a two-pronged approach to the whole issue here. One is look at what the employer here at the school wants. It wanted a educator, and it had as a bona fide occupational qualification, which is permissible under Title VII, a Catholic. So, yes, it can discriminate in favor of hiring Catholics. That's the bona fide occupational qualification. Could it have said we only want nuns? Yes. And so it could have said we only want women. Or priests. But it could have said we only want women. Or priests. No, no. That would be gender then. Well, when we say we only want nuns, it's gendered. But – Well, I'm sorry. When you said nuns – And when we say we only want priests, that's also gendered. That's my question. Can it discriminate based on gender in the hiring context? Well, the Roman Catholic Church, Your Honor, is a male-oriented society. I know. But in this case, could it have discriminated based on – in hiring based on gender? It had a lay principal contract and a religious principal contract. My question is, could it have said with respect to lay principals, we only want women? Not under Title VII, Your Honor, no. Under Title VII, no. And if – this is why the Court has to distinguish between a religious organization, a religiously affiliated organization, and a church. If you're talking about the church proper, the religious group in its religious things, it can discriminate any way it wants. It can be anti-black, anti-everything, and it's permissible under the First Amendment. But when the church, regardless of whether it's a nice church, and I love the Pope Francis, or Islamic radical or whatever terrible type of church, within the church and the religious function, it can do anything it wants short of violence under the First Amendment. But when the church then goes into the secular world, and when the church, the archdiocese here, is either doing education or Bible manufacturing company, it's in the secular world. We're faced with a lot of language in here that suggests that it's a particularly religious mission that lay teachers have. You know what I'm talking about. Let me finish. In the manual, it talks about instruction to new teachers on the Catholic identity of the school and ensure that all teachers understand that the church puts its trust in them to provide faith education and help students integrate the gospel into daily living. That sounds pretty religious to me. There's a number of things on that. One is I brought out, Your Honor, that the church did not bless that document. And many of the things in that document are hearsay, they're from lay people. It's not an authoritative document. If you want to look at the bylaws of this organization, look at the canon law of the Roman Catholic Church. Those are the bylaws. There's not one religious person who put an affidavit in this case saying my client is a minister. The Pope, I'm sure, would not say that. I'm sure the cardinal wouldn't. Or any bishop. You have lay people and the non-Catholic lawyers in this case who are characterizing my client as a minister. And the district court below, she said there's no dispute that Plano is not a member of the clergy and wouldn't be considered a minister for purposes of church governance. But here the issue is not canon law, but not canon law. And minister for purposes of the ministerial exception are far broader than the meaning that it does for internal church purposes. That, Your Honor, is asking this Court to say individual rights of Americans in this country are subservient to organized religion when the Constitution and the Bill of Rights specifically says we do not establish religion in this country. My client is a good Catholic. My client knows she wasn't a minister. She was hired as an educator. And what you apply to the Roman Catholic Church, and the problem here is, hey, everybody loves the archdiocese and their schools, but what you apply here applies equally to the Hasidic schools in this area, the radical fundamentalist Christian or Muslim or anything, like did the hypothetical. I could invent my own religion. What is the – can you – maybe this is a better way to address it, although I'm going to go back to the hiring context. What, in your view, is the scope of autonomy for these institutions to select their employees? It's clear, Your Honor, and this is my two-pronged approach, which I hope you will consider adopting. One is, see what kind of employee you want. If you want a secular employee, like they did with my client, here's a contract for a lay teacher position, lay principal position. Is a deacon a lay position in the Church? Well, Your Honor, this is what I'm saying. If the Church were to have said, have an invitation for religious principals. Answer my question. Is a deacon a lay position in the Catholic Church? There's a few – no. Sorry. Yes. A deacon, a priest, those are both religious figures under the bishop. The organization of a Catholic Church is the bishops run the show. The bishop of Rome is the pope at the top. The bishops run the show, and they can use, in teaching the word of God, the gospel, they could go to their priests or deacons, ordain ministers for that purpose. They can't go – that's – the canon law says we have the ministry and you have the laity. The Archdiocese website says we have the pastoral stuff. We have the education. Within – again, I didn't mean to get into Roman Catholic practice, but within the laity there are people who have significant jobs in the context of a church service. Is that correct? No, Your Honor. No, and also, even if so, Your Honor, for example, they talk about the choir person. Under Roman Catholic canon law, the music is a ministerial aspect of the religion. So when you're in the church house and when you're the music director, you have a ministerial role. And if the church were to hire somebody, put out for bid here, we're looking for a minister, we'll hire you, but you're coming in as a person in a ministerial role, just like if a priest were hired or a deacon hired or a nun hired or a friar hired and they know the role is religious to teach in Sunday school. Catholics don't have that, but let's say they did. Yes, or a monastery or a seminary. Those are religious things. But here, that's not what was bid. They were looking for an educator. My client has credentials at the wazoo as an educator. She has the same credentials as I have regarding being a Catholic, CCD, as a 13-year-old, got communion, and that was it. That's her educational background. And for this Court to say the civil law will retroactively turn a person who thought they're being employed by an entity that's religious, it's a religious-affiliated entity, a private school that's religious-affiliated, for her to be hired and then them to change the rules after the fact when she's complaining of, in this case, gender discrimination, but she just as easily could be complaining of race discrimination. And if this Court's going to say, okay, if you get hired as a lay principal and the new priest comes by and says, you're fired because I don't like Afro-Americans, if this Court's going to uphold ministerial immunity, it says, you don't have any rights to come to court. And if you say that for a private school, you also have to say that to a church-affiliated I did not understand the argument on the other side to suggest that there's no right to come into court. As I understand it, the ministerial exception is an affirmative defense. So the plaintiff always has an opportunity to test that defense to see if it's pretextual and so on, so there's a right to ---- No, Your Honor. It's absolute immunity. Yes, you go into court to say the employer shouldn't have that immunity, but once the employer establishes that you're a minister, you don't have any right to pretext. The Hosanna case was clear on that. The Hosanna-Tabor case is clear that what we're doing is saying for internal church governance, and that, I think, means church governance. It doesn't mean affiliated entity governance. My client wasn't even part of the parish of the St. Anthony school. Her parish was a different town. My point is you always have a ---- the plaintiff will always have an opportunity to test whether the ministerial exception applies. Sure, if it's the ultimate determination is that it applies, then there's an immunity. But you started out your statement by saying that we would shut out. If you lose, we would shut plaintiffs out. It would be a person like me, Your Honor, thinking about taking a case. And I would face, okay, I have a client who's a principal. I know that if I file a lawsuit, I immediately have a motion to dismiss on ministerial immunity grounds, and I'm going to lose. So I'm not going to take the case. And the way defendant would have this, it would have every case be very complicated where, just like here, they can come up after the fact and say, oh, well, you did this religious type of thing. And this ---- my client is a ---- Well, I'm sorry. Is it really your view that you have no argument available to you or that plaintiffs in your client's position have no argument available to them that the explanations are pretextual in the context of a ministerial exception? That's what O'Hara's paper case said, Your Honor. It says if we're not going to look at the underlying whether you have a discrimination case or not. I mean, if Your Honor is saying a pretext regarding ---- I thought that Hosanna Tabor said there is no ---- it's not a rigid formula. So ---- Right. But if you ---- in other words, if ---- But that's the way all immunities work. That's why they're called immunities. Do you know that there's an immunity? This is a little parochial on my part, but there's a similar immunity in defamation cases that if it's about religion, you go into court, you say, he defamed me. Coast to coast, it's thrown out then. It's an effective immunity, very similar to this. And if this Court says that a person who teaches elementary school students or supervises them is a minister because it's in a Catholic ---- I mean, that's exactly what is going on in the nation right now. The Catholic Church was trying to negotiate contracts in San Francisco where it included in the collective bargaining agreement that the teachers union would agree that the teachers had, you know, were teaching the word of the Lord that they are ministers for purposes of education. The employer, all the employer needs to do is start saying, I did that with my legal law first hypothetical. I've invented my own religion. I believe it truly. And then I say, okay, now we have to do this. Did not regularly lead a Catholic, the students in Catholic prayer? No, Your Honor. I don't think so, Your Honor. But I will say we did ---- But the manual, just to pick up on that question from Judge Sachs says it provides that the principal directs the implementation of the religious education program is committed to the mission of evangelizing, involves the staff in formulating plans that enable the school to meet its religious goals, provides opportunities for students, faculty, and parent participation in liturgical and paraliturgical services. I would say that is hearsay based upon people writing it who are lay people not with authority of the church. The church manual of my client ---- A-133 of the record. But my client's employer, Your Honor, said we don't discriminate on the basis of creed. The archdiocese says in our schools we don't discriminate on the basis of creed. They're not advertising that they're evangelizing to the Jewish student who happens to be in the archdiocese school. So the Jewish student may have a cause of action for being misled and they're going there. But the question is what happens there, not what they, assuming you were right, not what they say happens there. Isn't it true that she would have students read prayers over the public address system and then herself read to the Lord's Prayer thereafter? When I was a beginning student in public school we had prayers read in the beginning until the Supreme Court came around. I conceded some of the issues because the issues that I knew the employer could eventually impose. The employer can certainly impose on a principal who's a lay principal if I got a job there. They had nobody else. Mike Diedrich gets the job as a principal there and they said lead some prayers. That doesn't make me a minister. I picked one thing because I can't sit here and read the whole record to you. The question is in light of her duties as disclosed in the whole record, does it fit within the amenity? And that's the question. That's the immunity as outlined in the most recent Supreme Court. The court should view it statutorily as a bona fide occupational qualification. If she can't do the job of being a good Catholic principal because she doesn't know the Lord's Prayer, you're fired because you don't know the basics of Catholicism. So that statutory protection that they have is fine. But this Court wants to take it to the constitutional level. And the constitutional level means if my client as principal says to the boss there at the archdiocese, you know what, the teachers are prejudiced against the students because they're black or there's one Jewish kid and they're picking on the Jewish kid, and the teacher, the principal were to say to her bosses, you know what, we have these rules, we don't do this in our schools, and the boss says, you know what, you're fired. If it's only Title VII protection, she would have a cause of action. That raises an interesting question on both sides, and that is, does it matter? Once you decide if you decide that there is a ministerial immunity available or while you're deciding it, does it matter what the cause of the termination is? That is, does it matter whether it was supposing, let's assume she's a minister, let's assume she would otherwise fall within this doctrine, but she's fired because she catches another person stealing money, and then she's fired for that. That's, I mean, as I read the most recent Supreme Court case, they don't seem to care what the reason for being fired is, just so long as she fits within the criteria that makes it religion. Your Honors, I think respectfully request you to consider that we should give religious protection to the church as church, and once we start going and saying it extends to the church-affiliated entities, the church-associated entities, here the private school that has the church values and so on and so forth. Once you take that, make that step, and Hosanna Tabor is clear. You had there a minister who wanted to be a minister. She wanted to be ordained. She wanted to be where the clerics. She was that. And the church there said, we as a church, in our church role, our ecclesial role, are taking that away from you, and therefore, you're no longer a minister. And she was in a job where I argued that that was required of her, to be a minister. That's my two-pronged test here. One is, what's the job you're hired for? If the job is as a clearly religious job, the priest for the parish, that's a ministerial job, and the courts have no role, no authority. Part of your argument rests on a dispute about whether or not your client provided the services that are described in the manual. So I mentioned all of these things that the manual provides that the principal must do. Are you disputing that she did that? What I didn't want to do— I think that that's a yes or no question. Go ahead. I think we conceded. And the reason I conceded all things which I thought that the archdiocese could eventually impose, because I didn't need a trial on things, which at the end of the day, all the archdiocese has to do is say, you know what, principals, you have to lead a prayer three times a day or five times a day. Or, you know, it's easy for the employer, after the fact, to say, you know what, in order for me to obtain— Why are you saying after the fact? They never called her a minister until she was fired. But all the things that we are pointing to from the manual and so forth, they didn't  No, well, Your Honor, I think you can fairly see in the manual and some other—like what they're trying to do in San Francisco with the contracts. You can see where there's a concerted effort by the organization. What can we do to turn our employees? Because once you say that my client, the principal, is a minister, clearly the next step is all the teachers are ministers. Because teachers have a full-day responsibility over the children, where the principal is doing all these administrative duties. So once you say a principal is a minister for civil law purposes, even though she's not a minister for Catholic purposes, because no Catholic is going to view her as a minister. I think that—actually, both sides—I think that the word minister, I don't think as much rides on that. Supposing—I'm talking to my law clerk—supposing she was referred to as a fireable employee, it wouldn't matter what name they give it, whether they call them a minister or not. That's why I go back to Hosanna Tabor. It says what we're not going to intrude into is church governance. Because in the church governance, the church person who's aggrieved can do, for example, ecclesial appeal. If my client were a priest that got defrocked, she could go to the bishop, she could appeal to Rome. In an ecclesial role, she could appeal within ecclesial authorities. But she had a contract, Your Honor. She didn't have any internal appeal right. She had a secular contract that says you have to be a good Catholic. It didn't say you are a minister. So if this Court— I'm sorry. And then I'm going to have to stop you because you've gone well past your time. But would you answer the following? We seem to, albeit in the context of a case that was decided before Hosanna Tabor, we seem to have said that the ministerial exception protects more than just ministers. And Hosanna Tabor doesn't, by its terms, limit it. It turns out that in that case, arguably, it was a minister, but it doesn't limit its holding to just ministers. I think your case, Your Honor, said that you limit—you're not going to limit it to ordained ministers. And I have no dispute about that. For example, a nun or a friar is not an ordained minister, but they're in a religious role. Well, here we—we then cited to the following cases, applying the ministerial exception to organist, music director, to a press secretary, to a director of music ministries, applying exception to staff of Jewish nursing home. And in all—I put—I referred to all those in my brief. All those have to do with activities that are in the church, this church, the church as a church role. If you're a choir director under Roman Catholic canon law—there was a canon law expert in that Texas case that said under Roman Catholic canon law, a choir—music is part of the liturgy. It's religious. The case involving— Prayer is not. That's what this—that's what you're claiming. But it's the governance of the church, Your Honor. Hobby Lobby will want prayer in its corporation. I may want prayer in my law firm. Just because you're imposing religious types of things on people does not turn them into a minister of the church for internal church governance purposes. And that's what Hosanna Tabor was talking about, saying the government cannot—absolutely is barred from intruding into internal church governance. But if you expand that beyond internal church governance, to every person you expand it to, you've deprived them of all their civil rights. We've kept you well, well past your time. You've reserved some minutes for rebuttal. And we'll hear from the other side. May it please the Court, Eric Rosbach for the appellees in this matter. Judge Seibel should be affirmed this case is a straightforward application of 45 years of ministerial exception precedent in the courts of this country and is in full harmony with both the Cote case that this court decided when it recognized the ministerial exception before Hosanna Tabor and Hosanna Tabor itself. Why is the designation when the manual describes all of these requirements that seem to be very religious and ministerial in nature? Well, that is a very important distinction that the Court should be aware of. That is, if you look at the contracts that are in the record at Appendix 166 and 169, you can see the difference between a contract for a religious principle and a contract for a lay principle. Lay does not mean — it's not the opposite of religious in terms of it being secular. Lay means that you're not a member of a religious order. So you're not a nun and you're not a brother. And, in fact, a priest that became a principal at an archdiocesan school would not use the religious principle contract, because if you look at that, it says that the — in lieu of the wages that would normally be paid to a principal, the religious order is paid money because they have essentially seconded their nun or brother to go be the principal of this case. So they take the word lay that has this technical term-of-art meaning within, you know, the Catholic Church and turn it into something that means secular. So the point is that the word lay in the terms that we're now talking about may be misleading. That is, I was — perhaps they should have called them fireable lay principles rather than lay principles. Well, and actually, I mean, we talked about this in our brief, but there's this idea of the lay ecclesial minister within the church, that you have lay ministers. There's lay people that do all kinds of parts of the ministry. That's what I was trying to get at, but there was some resistance to that idea. Yes, I noticed that. I think the other thing that's true — I think you asked a question about, you know, the term minister. That can also be a little bit misleading. The term minister is not determined by the canon law of the Catholic Church or what have you.  We've had this ministerial exception since 1972. But as you could see in the Hosina-Tabor case, you have the concurrence from Justices Alito and Kagan, where they basically say the word minister is not such a great word because it's kind of Protestant and it doesn't — you know, it doesn't fit every religion that well. Well, with the Hebrew home for the aged or whatever. Right, right. They point that out, that it doesn't fit that well. So you have to — you know, both with the lay versus religious principle distinction and with the minister distinction, you have to be careful to figure out what context you're actually talking about there. I think — We can in the Supreme Court say explicitly that we can take or maybe even should take into account what it's called, not the first of its three — Title. Title. That's true. The Court definitely can and I think should take into account Title. But here, if you look at the appendix again, pages 87 and 185, it literally says that principalship in an archdiocesan school is ministerial, quote ministerial. And the other thing is that with Title — the Title consideration, you actually have to think about what is the context of that, because there's some religions, for example, Presbyterianism or Quakers, where the person that's in charge of the relevant congregation is actually a clerk. So if you just take the word clerk in the abstract and kind of just take it out, it doesn't sound like a very high-up term, but it actually is the — Top person. Yes. And I think the same thing is true with the word cantor, for example. There's cantors in — there's Jewish cantors, there's Lutheran cantors, there's Catholic cantors, but they have very different roles in the different religions. It means sing, doesn't it? Well, and it means singer in Latin. But the idea is, like, you can't take the word cantor from the Jewish context and decide, okay, what does that mean for a Lutheran cantor? You have to have a little bit of context for the title. I think one other point I wanted to make sure the Court was aware of is that there's been eight cases that we're aware of where courts have applied the ministerial exception to a religious school principal, and all eight courts have held that it applied. Now, I think we cited six of them in our brief, and there's a couple others that we're aware of. Are those circuit courts? They're not all circuit courts. Some of them are district courts and some of them are state courts, because state courts often — Some of them are circuit courts. Yes. So the — let me look at it really quickly here. The — let's see. Actually, I don't think they are. Any of them are. None of those ones, literally about the principal, are circuit courts. But there have been — you know, for example, the Mignogore case that we cited, the Ganulski case that was just decided. So the point is that when courts have looked at this, they've decided, okay, you're the head of a religious school, this is something that, you know, it really matters what your religious leadership is. Here, of course, you know, there's sort of a cornucopia of evidence in the record that Ms. Fratello was carrying out religious functions. She led students in daily prayer, and that's not disputed. She gave them religious exhortations from the pulpit of the church. She wrote monthly religious messages to them and their families. She encouraged the parents to attend mass with her and the kids. She developed the school's religion curriculum. She was responsible for recruiting teachers to teach religion. And then after she hired them, she guided them and evaluated them on whether they were actually integrating religious — None of those, maybe for purposes of the case of litigation, none of these facts were disputed. Is that correct? That's right. There is a — you know, first of all, as Mr. Dedrick was mentioning, they conceded many of these facts at the summary judgment stage. But also, for example, the daily prayer issue, that was something where I think there was some unclarity about whether she had actually done that. Well, you know, Appendix 332 and 333, she was leading daily religious prayer and doing it with the kids over the intercom. So it's not a — you know, the idea that suddenly she was sort of surprised, you know, shocked, shocked that she was, you know, running a religious school is absurd, frankly. And, you know, the reality is that she knew from her contract itself. If you look at Appendix 84 and 85, she knew that — At 85, yeah. At 84 and 85, that's her contract that she signed. There's a big section about, you know, making sure that you're following the Catholic faith and being a Catholic leader. And — Can I ask, what role does the employment contract have with respect to the ministerial exception? So it's not an issue in our case. But if the contract has a termination only for cause provision and the person otherwise qualifies for the ministerial exception, can a court enforce that clause against the church? I think it would be hard to do one for cause. You could imagine situations where there's, say, a liquidated damages provision or something like that that a court could do. But if it's something where the court has to start delving into what is proper cause, then I think you end up with all of the problems that the ministerial exception — you know, the courts develop the ministerial exception spontaneously because it presents this obvious problem of what do I do about managing the internal workings of a church. Can the church waive the ministerial exception in a contract? So here it says — the contract says lay principle. Could a church expressly disclaim application of the ministerial exception in their contract? So as Judge Loyer was pointing out, it is an affirmative defense. There is actually some division about the question of whether you can still waive it because, for example, the Conlon court that decided the InterVarsity case after Hosanna Tabor said you can't waive it. Even if you wanted to, you can't waive it because it's a structural protection. But that's contrary, of course, to the idea of an affirmative defense. Well, I think that their idea is that there's still a structural problem. So they're saying it's not — Well, I understand the idea, but that is contrary to the idea of making it a affirmative defense. Yes. I think it's a bit odd because the ministerial exception is something where you're trying to protect the courts from getting into the church part. Yes. And so that's the issue. I agree that you're right, that the affirmative defense — It's difficult to use the terms we use right across the board precisely, I think, because the courts do this to protect themselves from having to get into things they don't think they should be in. And the fact that you both agree, both sides agree, doesn't mean that we want to get involved in it anymore than we already are. Well, I think that's right. I think the waiver issue with an affirmative defense is that what happens if that then forces the courts to sort of troll through a bunch of religious things and deal with religious questions? Well, that would be an exception to this case. It would just be a straight Title VII discrimination case because, for whatever reason, the ecclesiastical organization has decided not to invoke the exception. I'm just trying to think through this carefully because there's much at stake, as your adversary said. And what you're suggesting is that this may not appropriately be deemed an affirmative defense because it applies across the board regardless of the position of the defendant. That doesn't make sense to me. Well, I would refer, Your Honor, to the Sixth Circuit case, the Conlin case, where they really go into this issue. And I think it does make a certain amount of sense that separationist concerns, keeping church and state separate, you know, let's say I have a case where I want to, you know, bring it as a religious plaintiff and I want you to decide a religious question. And the other side says, fine, you know, go ahead and decide the religious question. The courts still can't decide the religious question because it's a court. It's sort of like a political question. It's a bit like, yes, that would be a good analogy. So, you know, is political question an affirmative defense? I don't know. But it's something where you could think about it. In any event, it's not involved. There's no rule. There's nothing here. And I don't think you have to reach that to decide this case, certainly. Could I possibly address a few of the things that came up in the argument with Mr. Diederich? One is that there actually is another case on the ministerial exception pending in this circuit, the Penn case that we cited in our briefing and has already been argued. The hospital case? That's correct, yes. So that came up as one of the issues. Is there not a – I don't know anything about the case. But is there not a possibility in that case that they determined that Methodist Hospital has nothing to do with the Methodist Church? I think that that's the issue in that case. It's not about – it's more – it's not so much about whether he is a minister because he's a chaplain of the hospital, but whether the hospital can actually invoke the ministerial exception. So this will probably be the first case that decides post-Hosina-Tabor, you know, who's a minister under the ministerial exception in the Second Circuit. That case – this case. This case will be. That case would be about – Are you kind of saying that it's a school, it's not a church, and therefore it doesn't apply? Well, obviously we take great exception to that. I mean, if you look at the entire record, it's replete with different things saying that, you know, propagating the Catholic religion is job number one at this school. And at all archdiocesan schools. And it is actually funded by the Archdiocese of New York. And they do report up to the Archdiocese. So this idea that it's sort of, you know, this church that kind of, you know, appeared by magic in Nanowit is just – It's not the hospital case. It's a chaplain. Oh, the hospital case? Who is the employee in that case? That's a chaplain. That's a chaplain. I'm sorry. I was talking about our case. Were you asking me about our case or the other case? We're talking about different things. But I'm following up because wouldn't it be prudent, since that's somewhat at issue in this case, to wait for that panel to determine its case? I wouldn't presume to tell the court how to, you know, deal between different panels. But I think that this case presents very different issues. And I think it's also just a lot clearer. So personally, I would – Do you know offhand what the status of the other one is? Has it been argued yet? It has been argued, but it was, I believe, a month ago approximately. It was argued in 2017. So I think that this case is a lot clearer and easier. So I think it's overwhelming evidence that she performed all these religious functions, she had a religious role. And if I could get back to a couple of other just points to sort of clear up that came from the argument earlier. The pastor and the principal both have religious leadership roles. That's laid out in the manual. I don't have the site right here, but it is pretty clear that the principal and the pastor are supposed to partner together to inculcate religion in the teaching. I believe Judge Sack asked about the no religious reason issue. If you look at Hosanna Tabor at 132 Supreme Court 709, it expressly says you don't have to show a religious reason. There's also a question about pretext. Hosanna Tabor also precludes the pretext question. Now, there was this interesting colloquy between Justice Scalia and the lawyer for the church in Hosanna Tabor at oral argument in Hosanna Tabor where they sort of made this distinction between a pretext and a sham. So, you know, Mr. Diedrich's hypothetical law, racist's law office, is that would be a sham. Pretext is why did you really fire the person, and that's what the Supreme Court said is off limits. Also, same thing with the BFOQ. That would specifically reject. A sham argument is not off limits. I think that's right. But that would be something where, you know, I think if you had something like the Church of Cognizance case that Judge Gorsuch decided, so we may be hearing a lot about it in the near future, but it was a case where some drug runners would hand out a certificate of ministry to every person they did business with. So if you're going to sell the drugs to me, I'm going to give you this so you're a minister in my church, and then we can all be protected by the First Amendment. It didn't work. So it's the United States against Quainton's case. And a court can determine without worries relating to the establishment clause that that is a sham. Right. So this goes to the principle of sincerity. That's a state-of-mind question, and you can decide, do they truly hold the beliefs? You can decide that, but you can't decide. That's not an issue in this case. That's not an issue in this case. We're getting pretty far afield, but I just wanted to address some of the things that were brought up earlier. Judge Loyer, you had mentioned the idea that it goes beyond ministers. That's clearly the case from the entire history of the ministerial exception. There's cases involving the press secretary, as you mentioned, multiple musical director cases, not just the one that happened after Hosanna Tabor, the Cannata case in the Fifth Circuit, but also the Diocese of Raleigh case that was written by Judge Wilkinson on the Fourth Circuit. And then, you know, there's also the Kosher supervisor in the Hebrew home of Greater Washington case, and a Jewish preschool teacher in the Temple Emanuel of Newton case. So it definitely goes beyond. And this gets back to that question of what does minister really mean? It's a legal term of art. It may be a problematic one, as Justices Alito and Kagan are saying, but that's the one that we have right now under governing law. And let me make sure I addressed all the things that brought up. Yeah, I think that's. Let me ask you the question that I think your adversary is trying to get us to worry about, and it's a legitimate, I think, question. Could a religious organization, I'm not talking about the Catholic Church, but some other religious organization that has the sincere belief, so it's not a sham, decide maybe mistakenly to hire someone who is black and then fire that person because that person is black and invoke the ministerial exception? Well, I think this court in the Coté case essentially said they could because that was what was at issue in the Coté case was the Justinian Mamu, the priest said this is racial discrimination. I'm from Africa. You're discriminating. You know, the Diocese of Norwich, Connecticut, is discriminating against me. So. And Osana Tabor has not changed that at all? No, I don't think so. I mean, that was a case involving a disability claim, so it came up under the ADA. But, you know, there's been a number of different race cases. They do tend to be, you know, they've come up in a number of different contexts. So there's age discrimination, disability discrimination, race discrimination, gender discrimination, and, you know, the Osana Tabor court said we've got to just keep that stuff off limits. And I think this court even said that in the Coté case a few years before Osana Tabor was decided. Can I ask you about one of the other concerns that Mr. Dedrick raised, which is a concern that essentially an employer could pull a bait and switch, hiring an employee for an essentially secular function and then imposing religious duties as a pretext for discriminatory, adverse employment action. What's your view on that concern? Well, so in the first instance, I think it's the pretext question is one that Osana Tabor put off limits. So it's not something where the court can sort of delve behind that. You know, with respect to the fairness question, you know, is this fair to do this, I think, you know, I think that's ultimately going to be a little bit fact-based. But in this case, it's crystal clear that she knew that she was, you know, that she had to inculcate that. And she called herself an excellent religious leader. And when she applied to the school, she said, you know, I'm a great spiritual leader. Because she was trying to get a job from a parish that was closing its school. She got a little bit of preference because she was at a parish with a closing school and was trying to get a job at St. Anthony's. And she said, you know, I'm a great religious leader. I'm really good at bringing Catholicism into this. You know, I really get this. And she had that Archdiocesan manual on her desk at St. Joseph's and at St. Anthony's. So, you know, maybe there's a fairness case out there somewhere. But this case is not it. But on these specific facts, you're saying that it's clear. It's crystal clear. Couldn't we make some effort in resolving this case, as the Supreme Court, I guess, does, to make clear what we're not saying as well as what we are saying? Well, I mean, this gets back to the idea we were talking about with the presumption idea in our briefing. And, you know, we offer that as a sort of helpful heuristic for the courts and actually for litigants in the lower courts. It provides sort of some content to the rule, so it's not just sort of this, you know, let's consider a whole bunch of factors and come up with an answer. But it also, you know, deals with the fact that there are a vast number of potential contexts where this could come up. So I think having that sort of presumption, a rebuttable presumption, would be actually a helpful sort of shortcut for courts. The other thing is that it – Counsel, what would be the basis for us to adopt the kind of presumption that you're suggesting for religious principles across all types of religious schools, based on the record that we have in front of us, which is about a Catholic school? Well, I think it would be something where you'd be recognizing a pattern in the law. So you'd be recognizing that, you know, there's certain – there's certain kinds of positions that are just much more likely to be ministerial. So, you know, you don't have any bishop cases in the courts because people have – you know, they just – no one's dared, as far as I'm aware. You do have some priest cases, some minister cases, some rabbi cases. But a lot of the cases are teacher cases, so they would not – I don't think they're in the presumption. They would be sort of in the middle gray area. And then you have, you know, custodial staff maybe at the other end, where you almost could have the – you know, the presumption might work the other way. If it's custodial staff, then you're probably not going to be that, and somebody has to rebut that. But I think it's important that it would have to be a rebuttable presumption because you can imagine some situation where the principal is at a school that is, you know, used to be associated with the church and still has the name on it but doesn't actually – St. Anne's, which is no association with the church but used to have an association 50 years ago. Well, that – I don't know St. Anne's, but you can imagine – Whatever. Yeah. St. Vladimir's. You know, something where it's, you know, used to have a connection, doesn't really anymore. So that's how the plaintiff in that kind of a case would rebut it and say, look, you know, I understand that there's this presumption, but I can rebut it because I can show that there's zero religious content at this school. Dealing with is trying to take something that looks like a bright-line rule or sounds like a bright-line rule and apply it to an infinite number of factual scenarios where it could come out one way or the other. And that's hard to do. Every factual situation has a little something else in it that pushes it towards or away from it. Well, and I think the other reason to sort of do that is that I think there's a problem when a lot of the cases go all the way through the system and come up to the Second Court of Appeals or the Supreme Court because there is an entanglement issue just in the process. And so, you know, entanglement between church and state. And so if you can get to a point where you say, look, okay, some of these cases are clearly, you know, going to be core ministerial. Some of them are not going to be. But we can at least kind of, you know, trim down, you know, deal with this vast number of contexts and kind of trim it down. That's the reason we suggested recognizing the presumption. But understanding that we could also, if we agree with you, just say in this case it's very clear without saying anything about other cases. That's right. You could have a just-the-facts man kind of opinion. Thank you very much. Thank you, Your Honors. Judge Lauer, if you say in this case it's clear, then this Court will be establishing religion in this country, there won't be any other cases like this to follow because it will be clear that no plaintiff's attorney will take this kind of case. And it will apply not only to then parochial schools, Catholic parochial, but all religious schools and then companies. And regarding religious schools, the Supreme Court in Pierce v. Society of Sisters recognized that the State can require a basic education for students up to age 17. That's what this school is giving. It's not a monastery, a seminary, a Sunday school. It's a private school that teaches a secular education so that at the end of the day, and this is why I feel so strongly about the schooling aspect of this case, at the end of the day, the graduate of that high school is a good American citizen, not an indoctrinated. The Catholic Church is pretty good at not indoctrinating, so I'll just admit that they do a great job. But every other type of religious school, Hasidic or Muslim or Buddhist or anything, the Diedrich Secular Humanist School. And secular humanism can have a religious First Amendment protection. So I can develop my own school in good faith, not be a sham, say it's secular humanism and this is my teachings, and now I have to direct my office manager to do newsletters and teachings about this and preach about it. Now I can fire her. No absolute immunity under this ministerial immunity thing. So one very important thing is to the extent this Court wants to Is there any evidence, and I don't mean to take up your time, but is there any evidence given the case law that's already out there that permits the invocation of a ministerial exception that more religious organizations are engaged in discriminatory behavior that we would be really worried about? So you're saying you're trotting out a parade of horribles, but I wonder if the parade of horribles wouldn't already be out of the gate given the prior case law. Well, because, Your Honor, the prior cases deal with legitimate ministers, people like the chaplain, you know, people like that. But right now the attempt, and this Court is going to be the leader on this, the attempt is to get the courts to broaden the scope of the First Amendment protection. And the Bill of Rights normally protects individuals. In this case, the Court's being asked to defeat the right of any religious individual who is employed by an employer where the employer could say you're now a manager, and if you're a manager, you're now a minister, and if you're a minister, we have complete immunity to fire you under this minister immunity doctrine. The second thing, Your Honor, is so one is I think you should be very reluctant to not see that ministerial immunity as a constitutional principle is extremely damaging to the civil rights of every individual, and the Constitution protects individuals. The First Amendment says not to establish religion, and it protects individuals, not organizations. The second thing I'd like to point out is, again, the validity which I think my two-prong approach will give to you. My two-prong approach, the first thing is, what's the contract offered? My client was offered a contract of lay employment, which was for a principal earlier as a teacher. If the employer wants to ask her to be a minister, it should have been in the contract clearer. This is nothing new. What about, I was in the military, as I mentioned, what about military chaplains? Two-prong approach. The chaplain applies for the job as a commissioned army officer. Good application. It's clear, though, that the religious credential is required. So you're employed by the army. If the Catholic Church defrocks its priest, who's an army chaplain, the army chaplain corps says, now you lose your employment, too, because you're not qualified. You lost the ecclesial side of the house. The church side of the house has taken away that credential, so you now lose your employment. If my client — what's your result in that case? My result would be if the church legitimately takes away the credential of the minister, then the employer says, I'm entitled to a minister. You — just like if it's a lawyer and I get disbarred, or an army doctor who loses medical license. You'll lose your credential, you'll lose your job. And if — in my client's case, Your Honor, if — knowing what I know now, and in the If the church started to impose upon my lay client — and lay is an English-language fictionary definition. It's non — it means non-religious. If my client would have suddenly been imposed or had imposed upon her, you know what, you need to do all these extra-religious things. I could say, as her lawyer, say, you know what, school? You didn't contract for that. My client's not going to do it. But here, I mean, your adversary pointed us to page 85 of the appendix, and she seemed, in one provision, to have contracted for a number of what seemed to me to be very religious duties. I think the contract does not show that, Your Honor. The contract says you're administering the Archdiocese Elementary School. I see you dispute that. Well, plus — plus one of — it's in writing, Your Honor, that the Archdiocese St. Anthony School said no discrimination on the basis of creed. So what happens when one of those students who's of a different creed comes and says they're picking on me because I'm Jewish, and my client says, you're right, stop that, and then the priest says, oh, you know what, you're fired? And we have absolute — absolute ministerial immunity to do that. We shouldn't be turning employees who are not legitimate ministers in the church function role. We should not be turning those people. The church is the religious aspect. When you go into the secular realm, which is what the archdiocese here is trying to do, expand the scope of its immunity to all things secular, and that's a slippery slope that will lead to — first it's the principal, then it's all the teachers of the Roman be — are calling themselves religious, even though under the Constitution states have the right to require education of students. I think we have the full benefit of your argument. And then it goes to businesses as well. Thank you. Thank you very much, Your Honor. Thank you very much. We'll argue it on both sides.